FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 SEP 20 AM 9: 20

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ODYSSEY RE (LONDON) LIMITED, formerly known as SPHERE DRAKE INSURANCE, p.l.c. | } } } } | |
| Plaintiff, | } } | |
| v. | } } | CASE NO. CV 99-B-0778-NE |
| POSITIVE PEST CONTROL, INC., DON JENNINGS, JOANNE WILSON, | } } } | **ENTERED** |
| Defendant. | } | SEP 2 0 1999 |

## MEMORANDUM OPINION

This case is before the court on plaintiff Odyssey re (London) Limited's (formerly known as Sphere Drake Insurance, p.l.c.) (hereinafter "plaintiff," "Odyssey," or "Sphere Drake") unopposed Motion for Summary Judgment filed on July 9, 1999. This declaratory judgment action involves Commercial General Liability Policy PU81438 ("the Policy") issued by Sphere Drake to Positive Pest Control, Inc. ("Positive Pest"). The "policy period" for the Policy was December 30, 1995 to December 30, 1996. After that date, Positive Pest obtained liability insurance from another insurer.

Sphere Drake seeks a declaration that it is not obligated under the Policy to defend or indemnify Positive Pest or its employee, Don Jennings ("Jennings"), in connection with a lawsuit brought against them by Joanne Wilson ("Wilson") in the Circuit Court of Madison County, Alabama, Civil Action No. CV98-2269-JPS ("the State Lawsuit"). Wilson owns a residence located at 9009 Cannastatt Drive, Huntsville, Alabama ("the Residence"). In her complaint, she

18

makes various allegations against Positive Pest and its employee, Jennings, regarding inspections by Positive Pest for termite infestation and damage and treatments for same.

In particular, Wilson makes the following factual allegations:

1. On or about 1996, 1997 and 1998, Jennings and Positive Pest failed to adequately inspect and/or report the condition of Wilson's residence for termites.

2. In or about March 1997, Wilson discovered active termites and termite damage in several areas of her residence and contacted Jennings and Positive Pest to return and re-treat for termites. Jennings and Positive Pest re-treated her residence but refused to repair the termite damage.

3. Jennings and Positive Pest inspected Wilson's residence in or about June 1998, and renewed their contract with Wilson. On said inspection, Jennings and Positive Pest failed to observe and/or report the existence of any signs of termite infestation or damage in Wilson's residence.

4. On or about October 1, 1998, Wilson discovered evidence of extensive termite damage in the residence which had not been discovered or disclosed in Jennings' and Positive Pest's June 1998, inspection.

(*Wilson* Complaint ¶¶ 6-8, 10, 13, 16, 20, 24, 28, 32) attached as Ex. B. to Pl.'s Compl.)

The *Wilson* Complaint contains counts against Positive Pest and Jennings for negligent and wanton inspection (Counts One and Two); reckless, fraudulent and willful misrepresentation (Counts Three, Five and Six); suppression (Count Four); willful deception (Count Seven);

negligent and wanton treatment (Counts Eight and Nine); breach of contract (Count Ten); and negligent or wanton training, supervision, hiring and retention (Count Eleven). (*Id.* ¶¶ 9-49.)

As a result of the foregoing, Wilson claims to have suffered the following injuries and damages:

> She was caused to suffer a loss of value to her residence; she was caused to lose the value of her purchase; she has been and will continue to be caused to incur bills for inspection and treatment of her residence for termites, she will be caused to incur bills for the repair of extensive damage to her residence; she will be forced to vacate all or portions of the residence during repair; and, she has and will continue to suffer great mental anguish and emotional distress.

(*Wilson* Complaint, ¶ 11.)

The Policy is a "Commercial General Liability Policy" which insures Positive Pest, the named insured, as well as other persons who qualify as insureds thereunder in accordance with the Policy's terms and subject to its conditions and exclusions. The Policy provides standard "occurrence"-based "general liability" coverage under which Sphere Drake agrees to pay for sums "the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' caused by an 'occurrence'" but only if the "'bodily injury' or 'property damage' occurs during the policy period." (Commercial General Liability Policy ("the Policy"), attached as Ex. A to Compl.) The Policy defines occurrence as "an accident." (*Id.*)

The Policy defines "property damage" as:

> a. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.'

(*Id.*)

3

The Policy contains an "Endorsement" entitled "Wood-Destroying Organism Inspection Coverage (Errors and Omissions)" which provides in pertinent part as follows:

1.  EXTENSION OF COVERAGE

    For an additional premium, Coverage A of the Commercial General Liability Coverage Form is extended to cover "property damage" to real property arising out of any actual or alleged negligent act, error or omission committed by:

    a.  The insured; or

    b.  Any person or organization for whose acts, errors or omissions the insured is legally liable;

    In the rendering of or failure to render professional services as an inspector performing physical inspections of real property to determine the presence or absence of "wood-destroying organisms" at the inspected property.

    But the coverage provided by this endorsement applies only if:

    (1) The inspection takes place in the "coverage territory" and during the "policy period";

    (2) The inspection is conducted in accordance with an "inspection contract";

    (3) You render an "inspection report" to the owner of the real property or other responsible person;

    (4) You charge a fee for your services in performing the inspection; and

    (5) The "property damage" to the real property caused by "wood-destroying organisms" at the inspected location is;

        (a) Discovered within one year after the date of the physical inspection on which the "inspection report" was rendered; and

        (b) Reported to us within 380 days after the date of the physical inspection.

4

>The "property damage" which is covered by this endorsement shall be deemed to have occurred on the date of the physical inspection on which the "inspection report" was rendered.

(*Id.*)

The Policy contains another "Endorsement" which excludes coverage for claims for punitive damages. (*Id.*). In addition, the Policy's exclusions exclude from coverage "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."

Although Wilson's complaint alleges that Positive Pest treated the Wilson residence in 1992, which was prior to the inception of any coverage for Positive Pest by Sphere Drake, it alleges only that Positive Pest inspected the premises each year thereafter up to and including 1996. It does not allege any damage during that period of five years.

In her deposition in the *Wilson* case, Wilson testified that in 1992, while she was bonded with Terminix, she found "sawdust" in her dining room. She called Terminix and was informed that they could not look at the problem "for two weeks." (Wilson Dep. at 10, 11, attached as Ex. B to Pl.'s Mot. Summ. J.) She knew Don Jennings "was in bug control because she worked with his wife." (*Id.* at 12.) She testified that Jennings came out and said that she had a bad termite problem and the termites were "getting ready to swarm." (*Id.* at 13.) She further testified that Jennings told her the problem needed to be "taken care of, like now." (*Id.*)

Thereafter, Positive Pest treated the Wilson residence and issued a her a "bonded repair contract dated June 8, 1992." (*Id.* at 14.) She further testified as follows:

>Q.   Did Positive come out and do their annual inspection?
>
>A.   Yes. They did.
>
>Q.   Same question for 1994, did they come out?

5

> A. They came every June.
>
> Q. So, they came out in '93, '94, '95, '96, any problem during any of those years when they came out?
>
> A. No.
>
> Q. I assume you had some problems in 1997?
>
> A. That's right.
>
> Q. When in 1997?
>
> A. I believe it was in January or February of 1997 I found the first bit of sawdust right in the corner in the south side of the -- rght [sic] into --
>
> Q. Foyer area?
>
> A. Uh-huh, in the foyer.

(*Id.* at 19).

She also testified that, pursuant to the bond, Positive Pest paid for the necessary repairs in 1997.

> Q. Where you satisfied with that, with the work that was done?
>
> A. Yes.
>
> Q. Where you satisfied with the way Positive responded to that complaint?
>
> A. Yes.

(*Id.* at 26.)

> Q. And I take it, no other problems during 1997?
>
> A. No.

(*Id.* at 27.)

6

> Q. As I understand it, you don't have a problem with what Positive did in 1997?
>
> A. I did not; it was fine.

(*Id.* at 41.)

Wilson's next problems, and those giving rise to her lawsuit, were in "late October or early November of '98." (*Id.* at 28.) Wilson described the problems giving rise to her lawsuit as follows:

> Q. Now you've sued Don Jennings individually, and Positive Pest Control; tell me, if you would, what you say Don Jennings did wrong, just in your own words.
>
> A. Well, I believe that when they come out to do an inspection, if the damage is as obvious as mine was [in late October or early November of '98] that it should have been noticed that at the time the inspection was done in '98.
>
> Q. When, in June of '98?
>
> A. Yes.

(*Id.* at 47.)

The first notice Sphere Drake received of the claims of Wilson against Positive Pest was on November 18, 1998. (Affidavit of Sean Harty, attached as Ex. A. to Pl.'s Mot. Summ. J.)

Plaintiff moves for summary judgment in its favor declaring and determining that there is no coverage under the Policy. By Order entered July 15, 1999, the court put the motion on a briefing schedule and set oral argument for 2:00 p.m. on October 12, 1999. Defendants' brief and evidence in opposition to the motion were due on or before August 13, 1999. Defendants

7

did not file any evidence in opposition to plaintiff's Motion for Summary Judgment and did not submit a brief in opposition to the motion.

One of the defendants, Positive Pest, is represented by its owner, Carol Farris, who is not a lawyer. Accordingly, pursuant to the procedure set forth in *McBride v. Sharpe*, 981 F.2d 1234, 1236 (11th Cir. 1993), on August 25, 1999, this court issued an Order giving Positive Pest ten-days notice of its right to file affidavits or other materials in opposition to the motion and notifying defendant Positive Pest of the consequences of default. An explanation of Rule 56 was attached to the Order.

The Order directed Positive Pest to file any opposition to plaintiff's motion, including evidence in support of such opposition, on or before September 10, 1999. Defendant Positive Pest did not file any evidence in opposition to plaintiffs' Motion for Summary Judgment and did not submit a brief in opposition to the motion.

Federal Rules of Civil Procedure 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

Thus, although a court may not grant a motion for summary judgment simply because the motion goes unopposed, it may do so if summary judgment is otherwise appropriate.

Applying the standards governing summary judgment to the facts of this case, the court concludes that there is no genuine issue as to any material fact, and plaintiff is entitled to a judgment as a matter of law. Defendants have not come forward with **any** evidence, much less evidence showing a dispute as to any factual contention of plaintiff. Thus, defendants have not only failed to meet their burden "to go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324, but also, and most importantly, the facts and law applicable to this case warrant a grant of summary judgment for plaintiff. Consequently, the court holds that the plaintiff's Motion for Summary Judgment is due to be granted.

Consequently, the court finds that the rights and liabilities of the parties under the Policy and in relation to the State Lawsuit are declared as follows:

1. To the extent the State Lawsuit involves a claim for punitive damages, there is no coverage under the Policy for punitive damages.

2. To the extent the State Lawsuit alleges a claim for "bodily injury," such bodily injury was suffered after the expiration of the Policy and is therefore not covered by the Policy.

3. To the extent the State Lawsuit alleges a claim for "property damages" resulting from an inspection performed by Positive Pest in 1996, such damage was not first reported to the carrier within 380 days of the inspection and is therefore not covered by the Policy.

4. To the extent the State Lawsuit alleges "willful misrepresentation" or "willful deception," such claims do not allege an "accident" and therefore do not allege an

"occurrence" as defined by the Policy. Such claims, therefore, are not covered by the Policy.

5. To the extent the State Lawsuit alleges a claim for an act or omission by the defendants (in the State lawsuit) after December 30, 1996, there is no coverage under the Policy.

To the extent the plaintiff moves for summary judgment on a declaration of rights and liabilities of the parties under other provisions in the Policy, the need for such declarations is rendered moot by the above findings.

An Order granting plaintiff's Motion for Summary Judgment will be entered along with this Opinion.

**DONE** this 20th day of September, 1999.

Sharon Lovelace Blackburn
**SHARON LOVELACE BLACKBURN**
United States District Judge